FILED
2021 Sep-29  PM 03:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **SANDRA J. STATEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:19-cv-01446-AMM** |
| | ) | |
| **FEDERAL INSURANCE** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION ON PARTIES' MOTIONS FOR SUMMARY JUDGMENT AND ORDER ON OTHER PENDING MOTIONS

This case is before the court on Defendant Federal Insurance Company's ("Federal") Motion for Summary Judgment, Doc. 55, and *pro se* Plaintiff Sandra J. Staten's Motion for Summary Judgment, Doc. 61. Further, before the court is Federal's Motion to Exclude Expert and Opinion Testimony from Dr. Kathleen Fix, Doc. 49, Ms. Staten's Motion to Exclude Federal's Exhibit 25, Document 58-5, Doc. 63, and Ms. Staten's Motion to Exclude Federal's Expert Dr. Aaron Sylvan Lord Report, Doc. 64. For the reasons explained below, Federal's motion to exclude is **GRANTED IN PART** and **DENIED IN PART**, and both of Ms. Staten's motions to exclude are **DENIED**. Further, Federal's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**, and Ms. Staten's motion for summary judgment is **DENIED**.

## I.     BACKGROUND

### A. Procedural History

On September 3, 2019, Ms. Staten filed her original complaint, Doc. 1, which she amended on October 11, 2019, adding Federal as a defendant, Doc. 4. On March 13, 2020, Ms. Staten filed her Second Amended Complaint, naming Federal as the sole defendant in this two-count lawsuit for breach of an insurance contract and bad-faith refusal to pay claims under that insurance policy. Doc. 23. On March 27, 2020, Federal filed its answer to the Second Amended Complaint. Doc. 24.

On June 3, 2020, this case was reassigned to the undersigned, Doc. 27, and a revised Scheduling Order was entered, setting a discovery deadline of November 20, 2020, and a dispositive motion deadline of December 11, 2020, Doc. 29. The court granted the parties' request for an extension of those deadlines by thirty days and set the discovery deadline for December 21, 2020, and the dispositive motion deadline for January 11, 2021. Doc 43.

The parties then filed the following five pending motions:

*First*, on December 21, 2020, Federal filed a Motion to Exclude Expert and Opinion Testimony from Dr. Kathleen Fix. Doc. 49. Ms. Staten filed her response to Federal's motion to exclude on December 28, 2020, Doc. 52, and Federal filed its

reply on January 4, 2021, Doc. 53. Ms. Staten filed a sur-reply on January 7, 2021. Doc. 54.[1]

*Second*, Federal filed its Motion for Summary Judgment on January 8, 2021, Doc. 55, and its Memorandum of Law Supporting Federal's Motion for Summary Judgment on January 11, 2021, Doc. 60. On February 8, 2021, Ms. Staten filed her response. Doc. 72. On February 22, 2021, Federal filed its reply. Doc. 75. On February 25, 2021, Ms. Staten filed a "Response to Federal's Reply," which filing the court construes as a sur-reply. Doc. 76.[2]

*Third*, on January 13, 2021, Ms. Staten filed a Motion for Summary Judgment and Supporting Memorandum of Law. Doc. 61. On February 3, 2021, Federal filed its response in opposition to that motion. Doc. 70. On February 12, 2021, Ms. Staten filed a "response to [Federal's] Response to [Ms.] Staten's [M]otion for Summary Judgment," which the court construes as Ms. Staten's reply. Doc. 74.

*Fourth* and *Fifth*, on January 19, 2021, Ms. Staten filed a motion to exclude Federal's Exhibit 25 (Doc. 58-5), Doc. 63, and a motion to exclude the expert report of Dr. Aaron Sylvan Lord, Doc. 64. On January 27, 2021, Federal filed its response in opposition to both motions to exclude. Doc. 66. On February 4, 2021, Ms. Staten

---

[1] Because Ms. Staten filed a sur-reply without seeking leave of court, the court will not consider the arguments presented in that filing. *See* Doc. 28 at 7 ("Sur-replies are not permitted without leave of court.").

[2] Because Ms. Staten filed another sur-reply without seeking leave of court, the court will again not consider the arguments presented in that filing. *See* Doc. 28 at 7.

filed a "response" to Federal's opposition to the motions to exclude, which the court construes as Ms. Staten's reply. Doc. 71.

### B. Motions for Summary Judgment

The undisputed facts material to the parties' motions for summary judgment are as follows:

Mr. Staten's insurance policy provides that Federal "will pay up to the applicable Benefit Amount . . . if an Accident occurring anywhere in the world results in a loss not otherwise excluded," and that "[t]he Accident must result from a covered circumstance and . . . [t]he Loss must occur within one (1) year of the Accident." Doc. 56-1 at 3 (emphasis omitted); Doc. 60 ¶ 6; Doc. 72 ¶ 6. The policy defines "Accident" as "a sudden, unforeseen, and unexpected event which happens by chance, arises from a source external to the Covered Person, is independent of illness, disease or other bodily malfunction and is the direct cause of loss." Doc. 56-1 at 9 (emphasis omitted); Doc. 60 ¶ 7; Doc. 72 ¶ 7. The policy further provides that it "does not apply to any Accident, Accidental Bodily Injury or loss caused by or resulting from, directly or indirectly, a Covered Person's emotional trauma, mental or physical illness, disease, . . . bacterial or viral infection, bodily malfunctions, or medical, surgical or diagnostic treatment thereof." Doc. 56-1 at 8 (emphasis omitted); Doc. 60 ¶ 8; Doc. 72 ¶ 8.

On October 31, 2016, Mr. Walter Staten fell while boarding a bus and sustained an abrasion of his left shin. Doc. 56-2 at 4; Doc. 72-1 at 28; Doc. 60 ¶ 12; Doc. 72 ¶ 12. On December 23, 2016, Mr. Staten fell again, went to the emergency room, and told his doctors that he landed on his right side and hit the right side of his head. Doc. 56-5 at 5, Doc. 72-1 at 40; Doc. 60 ¶ 20; Doc. 72 ¶ 20. On May 4, 2017, Mr. Staten was referred to hospice provider Oasis. Doc. 57-9 at 1; Doc. 60 ¶ 47; Doc. 72 ¶ 47. Mr. Staten passed away on September 6, 2017. Doc. 58-5; Doc. 60 ¶ 60; Doc. 72 ¶ 60. Mr. Staten's death certificate provides that the "manner of death" was "Natural Causes" and that the "immediate cause" of death was "Atherosclerotic Heart Disease of Native Coronary Artery." Doc. 58-5; Doc. 60 ¶ 62; Doc. 72 ¶ 62.

After Mr. Staten's death, his wife, Ms. Sandra Staten filed a claim for accidental death benefits, but she did not provide Federal's third-party administrator with the medical information that it requested. Doc. 58-10 at 18; Doc. 72-1 at 78–83; Doc. 60 ¶¶ 71–75; Doc. 72 ¶¶ 71–75. Further, Ms. Staten provided Federal's third-party administrator signed HIPAA authorization forms, as was requested, but the forms she provided did not name the facility or provider from which the requested information was to be released. Doc. 51 at 11–13; Doc. 58-10 at 6–21; Doc. 60 ¶ 72; Doc. 72 ¶ 72; Doc. 72-1 at 79–80.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate when the party moving for summary judgment establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). If the moving party has carried its burden, Rule 56 requires that the nonmoving party "go beyond the pleadings" and establish that there is a material fact in genuine dispute. *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c)(1)(A). A fact is "material" if it could "affect the outcome" of the case. *Furcron v. Mail Ctrs. Plus*, *LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (internal quotation marks omitted). A material fact is in "genuine" dispute if a reasonable jury could return a verdict in favor of the nonmoving party. *Id*.

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986). "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (citation and internal quotation marks omitted).

III.   ANALYSIS

A. Parties' Motions to Strike and/or Exclude

It is a "well-established rule that at the summary judgment stage, [district courts] 'may consider only that evidence which can be reduced to an admissible form.'" *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1207 (11th Cir. 2013) (quoting *Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005)). Accordingly, the court will consider the parties' motions to exclude before considering their dispositive motions.

1. Federal's Motion to Exclude Testimony of Dr. Kathleen Fix and to Strike the July 20, 2020 Letter

On July 27, 2020, Ms. Staten filed her Expert Witness List, naming Dr. Fix as the sole expert witness for the plaintiff and attaching a letter from Dr. Fix, dated July 20, 2020. Doc. 30 at 1–2. The court directed the Clerk of Court to seal the Expert Witness List because the attachment contained unredacted personal information and ordered Ms. Staten to file a redacted version of that filing. Doc. 32. Although Ms. Staten did not file a redacted version of the Expert Witness List, she has included a redacted copy of the letter from Dr. Fix in various other filings with the court. *See* Doc. 52 at 13; Doc. 54 at 9; Doc. 61-2 at 9; Doc. 72-1 at 62; Doc. 74 at 66. The letter from Dr. Fix stated in relevant part that:

> Mr. Staten . . . suffered a fall in December 2016 and hit his head. After that[,] his health began to decline significantly. I began seeing him in July 2017. . . . Although I did not care for Mr. Staten prior to the fall[,]

> his wife described his health as good. I did review his VA records prior
> to the fall and in August 2016 he was able to walk with a walker, feed
> himself, converse normally and was continent of bladder and bowel. He
> did have preexisting diagnoses of diabetes, chronic pancreatitis and
> heart disease. However, his precipitous decline and ultimate death was
> felt to be due to the fall.

Doc. 52 at 13. Dr. Fix's letter is dated July 20, 2020, *id.*, more than ten months after

Ms. Staten filed this lawsuit on September 3, 2019, Doc. 1.

Federal asserts that, shortly after the parties' mediation on September 17,
2020, counsel for Federal informed Ms. Staten that it "intended to depose Dr. Fix in
her capacity as an expert witness." Doc. 49 at 2. In October 2020, Federal "issued
two notices for Dr. Fix's deposition," and when Federal contacted Dr. Fix to
schedule her deposition, Dr. Fix "responded that she 'needed to alert the VA legal
department' regarding Federal's deposition notice." *Id.* at 3 (alterations accepted).
After Federal provided an attorney working at the Birmingham VA Medical Center
copies of its discovery requests, a staff attorney at the VA Office of General Counsel
sent counsel for Federal an email providing in relevant part that:

> I am unsure why anyone reported Dr. Fix as an "expert witness". It is
> expressly against federal regulation[s] for a VA employee to serve as
> an "expert" in any litigation which the VA is not a party. . . . Therefore,
> Dr. Fix is not authorized to testify as an expert witness.
>
> . . .
>
> As to testimony as a fact witness, please note VA regulations restrict
> disclosures of official information by Department of Veterans Affairs
> employees. . . . This prohibition against disclosure applies even if the
> information has been subpoenaed. To date, neither party has complied

with federal regulations and provided our office with the information
necessary to consider authorization. In August 2020, I reviewed the
order . . . submitted to obtain VA medical records. I authorized that
release. Therefore, those records stand as testimony by the VA.

. . .

[A]t this time, it is our determination that the VA employee is not
authorized by this office or required to comply with the demand [for
the testimony of Dr. Fix].

Doc. 49-2 at 1. Federal asserts that prior to receiving that email, it was "unaware of

the VA's position that Dr. Fix is not authorized to testify as an expert witness," and

"was unaware that [Ms. Staten] had not secured approval for Dr. Fix to provide

testimony of any kind." Doc. 49 at 4 (internal quotation marks omitted).

Federal moves the court "to exclude impermissible expert and opinion

testimony from Dr. Kathleen Fix." Doc. 49 at 1. Specifically, Federal asserts that

"Dr. Fix is not authorized to testify as an expert witness as a matter of law," and thus

"requests [that] the [c]ourt exclude impermissible expert and opinion testimony from

Dr. Fix and strike the July 20, 2020 letter from Dr. Fix that Plaintiff attached to her

Expert Witness List." *Id*. at 4–6 (emphasis omitted). Further, Federal asserts that,

"[t]o the extent Dr. Fix provides testimony in this case, the court should prohibit Dr.

Fix from testifying on matters reserved for expert testimony," including "any

testimony by Dr. Fix on whether the December 2016 [fall] caused [Mr. Staten's]

death in September 2017." *Id*. at 6–8 (emphasis omitted).

In response, Ms. Staten asserts that "there were work-arounds for issuing non-party subpoenas to the Federal government, as well as informing them of [Ms. Staten's] status of official substitute for her veteran husband with the Department of Veterans Affairs [(the "VA")]." Doc. 52 at 5. Ms. Staten cites cases from other jurisdictions regarding the obligations of federal agencies to comply with subpoenas. *Id*. at 5–6. Further, Ms. Staten asserts that Federal "fail[ed] in properly applying for the subpoena for Dr. Fix['s] testimony," and should have done a number of things differently: (1) Federal should have included more information in "the deposition subpoena,"[3] (2) Federal should have submitted a subpoena to the VA pursuant to Federal Rule of Civil Procedure 30(b)(6) to "sidestep[]" issues presented under the *Touhy* doctrine "and potentially provided Federal with the same information," (3) Federal should have kept the scope of any subpoena or deposition notice "narrow and also include[d] a cover letter offering [to] cooperate with the agency," and (4) because "it was not an impossible feat for Federal . . . to seek to depose Dr. Fix," Federal should have sought to take Dr. Fix's deposition "in accordance with the regulations as prescribed by the [VA's Office of General Counsel]." *Id*. at 6–7, 9. Ms. Staten asserts that Federal "does not really want Dr. Fix['s] deposition, and never has because it is not in [its] favor." *Id*. at 10 (emphasis omitted).

---

[3] The court assumes that Ms. Staten is referring to Federal's deposition notice for Dr. Fix when she refers to a "deposition subpoena." Doc. 52 at 6.

Further, Ms. Staten asserts that "Federal is mistaken in [its] effort to discredit Dr. Fix['s] written statement dated July 20, 2020, which specifically relies on the medical records," not upon the information provided to her by Ms. Staten "about her husband['s] previous state." *Id*. at 8–9. Ms. Staten also asserts that the Veterans Affairs' Office of General Counsel did not "finalize a denial of Dr. Fix" as a witness, but rather determined that "at th[e] time" of Federal's request for Dr. Fix's testimony, she was not authorized or required to comply with Federal's demand. *Id*. at 4, 12. Ms. Staten further asserts that, "if this case proceeds to trial[,] Dr. Fix will be allowed to testify on behalf of the [decedent]." *Id*. at 10. Ms. Staten attached a redacted version of Dr. Fix's letter dated July 20, 2020, to her response. Doc. 52 at 13.

### a. Dr. Fix is Excluded from Providing Expert and Opinion Testimony

Pursuant to applicable federal regulations, "VA personnel shall not provide, with or without compensation, opinion or expert testimony[4] in any legal proceedings concerning official VA information, subjects or activities, except on behalf of the United States or a party represented by the United States Department of Justice." 38 C.F.R. § 14.808(a). If it can be shown that "there are exceptional circumstances and

---

[4] Under these regulations, "testimony" is defined as "[t]estimony in any form, including personal appearances in court, depositions, recorded interviews, telephonic, televised or videotaped testimony or any response during discovery or similar proceedings, which response would involve more than the production of records." 38 C.F.R. § 14.802(f).

that the anticipated testimony will not be adverse to the interests of the Department of Veterans Affairs or to the United States, the responsible VA official . . . may, in writing, grant special authorization for VA personnel to appear and testify." *Id*. "In deciding whether to authorize the disclosure of VA records or information or the testimony of VA personnel, VA personnel responsible for making the decision should consider [various] types of factors," including but not limited to

> [t]he need to avoid spending the time and money of the United States for private purposes and [the need] to conserve the time of VA personnel for conducting their official duties[,] . . . [w]hether the disclosure of the records or presentation of testimony is necessary to prevent the perpetration of fraud or other injustice in the matter in question[,] . . . [w]hether the demand or request is unduly burdensome or otherwise inappropriate under the applicable court . . . rules[,] . . . [w]hether such release or testimony reasonably could be expected to result in the appearance of VA or the Federal government favoring one litigant over another[,] . . . [w]hether such release or testimony reasonably could be expected to result in the appearance of VA or the Federal government endorsing or supporting a position advocated by a party to the proceeding[,] . . . [t]he need to prevent the public's possible misconstruction of variances between personal opinions of VA personnel and VA or Federal policy[,] . . . [t]he need to minimize VA's possible involvement in issues unrelated to its mission[,] . . . [w]hether the demand or request is within the authority of the party making it[,] . . . [w]hether the demand or request is sufficiently specific to be answered[, and] . . . [o]ther matters or concerns presented for consideration in making the decision.

38 C.F.R. § 14.804.

"Upon a showing by the requester or court or other appropriate authority that, in light of the factors listed in § 14.804, there are exceptional circumstances and that the anticipated testimony will not be adverse to the interests of the Department of

Veterans Affairs or to the United States, the responsible VA official . . . may, in writing, grant special authorization for VA personnel to appear and [provide opinion or expert testimony]." 38 C.F.R. § 14.808(a). Further, "[i]f VA personnel who are unaware of these regulations provide expert or opinion testimony concerning official VA information, subjects or activities in any legal proceeding . . . without consulting with the responsible VA official, the witness, as soon after testifying as possible, shall inform the responsible VA official of the fact that such testimony was given and provide a summary of the expert or opinion testimony given." 38 C.F.R. § 14.808(d).

Federal asserts that "[t]he regulations commonly known as *Touhy* regulations provide that VA personnel generally are prohibited from offering expert and/or opinion testimony." Doc. 49 at 4 (citing 38 C.F.R. § 14.808). Federal cites three cases from district courts in other circuits to support its assertion that "[c]ourts across the country enforce *Touhy* regulations and have prohibited VA doctors from testifying as expert witnesses": *Munoz v. FCA US LLC*, No. CV 17-881 WJ/SCY, 2020 WL 4500603 (D.N.M. Aug. 5, 2020); *Cooper v. Wal-Mart Transp., LLC*, 662 F. Supp. 2d 757 (S.D. Tex. 2009); *Milton v. United States*, No. CV-S-02-0906-PMP(RJJ), 2005 WL 8161652 (D. Nev. July 19, 2005).

In *Munoz*, the defendant filed a motion to exclude certain expert and opinion testimony of the plaintiff's treating physicians at the VA provided during their

depositions. *Munoz*, 2020 WL 4500603, at *1. The district court observed that "[t]he *Touhy* regulations [under 38 C.F.R. § 14.808] provide that VA personnel are forbidden from offering expert and/or opinion testimony[;] . . . [t]hus, the testimony of the VA doctors is limited to their treatment of Plaintiff and their records based on their personal knowledge and observations obtained during their course of care and treatment of Plaintiff." *Id*. at *2 (internal quotation marks and citation omitted) (alterations accepted). Further, the court observed that "[a] treating physician is not considered an expert witness if he or she testifies about observations based on personal knowledge, including the treatment of the party," and that "[t]reating physicians are . . . exempt from the written report requirement in Rule 26(a)(2) of the Federal Rules of Civil Procedure." *Id*. But the court observed that "a treating physician cannot provide expert testimony regarding any opinion he formed based upon information learned outside of, and not related to, a patient's treatment." *Id*.

The *Munoz* court held that "[t]he *Touhy* regulations prohibit only **expert** opinions regarding official VA affairs unless the testimony is approved in advance[;] . . . [t]hus, the regulations do not preclude testimony that comes within the scope of treating physician testimony." *Id*. at *4 (emphasis in original). The court further held that "a treating physician may testify to possible causes and nature of Plaintiff's injury so long as these opinions are derived from their personal treatment of Plaintiff," and that "[a] treating physician's testimony related to causation is . . .

confined to purposes of deciding course of treatment." *Id*. at *5. The court excluded one doctor's testimony regarding "a diagnosis of the nature of Plaintiff's brain injury" because (1) the plaintiff's self-report of being unconscious was insufficient for the doctor to make such diagnosis, and (2) the doctor was a psychologist, not a medical doctor. *Id*. at *7. The court also excluded another doctor's testimony "regarding the nature and severity . . . of Plaintiff's brain injury" because (1) "his response was generated for workers' compensation benefits, which [wa]s not an issue in th[e] case," and (2) that doctor "specialize[d] in internal medicine, not neurology," and a "diagnosis of [Traumatic Brain Injury] is not one that would be based on mere observation and assessment by a treating physician who is an internist." *Id*. However, the court held that this doctor could "testify as a treating physician to his own assessment and conclusions as an internist based on a history taken from his patient as well as his own examination." *Id*.

In *Cooper*, the defendant moved to preclude the plaintiff from calling two VA doctors as witnesses at trial. The plaintiff designated one of the doctors as an expert witness, and indicated that the other doctor "could be a potential witness as well." *Cooper*, 662 F. Supp. 2d at 770. The defendant "submitted written requests to depose [the VA doctors]," but "[t]he VA denied both requests." *Id*.

The *Cooper* court observed that the defendant was "in a position analogous to a party whose opponent is attempting to designate an expert after the deadline for

doing so has passed." *Id*. The court further observed that, "[i]n those cases, a district court must consider four factors in determining whether the testimony of a late-designated expert witness should be permitted: (1) the importance of the witness's testimony; (2) the prejudice to the opposing party if the witness is allowed to testify; (3) the possibility that a continuance would cure potential prejudice; and (4) the explanation given for the failure to identify the witness." *Id*. at 770–71 (internal quotation marks omitted).

The court held that "[t]he fourth factor d[id] not apply . . . because there has been no lapse by Cooper for which he must provide an explanation." *Id*. at 771. The court found that "[t]here [wa]s scant evidence in the record about the importance of the[] witnesses," so "[t]he analysis must rest on the second and third factors." *Id*. The court held that "both [factors] favor striking the doctors as witnesses" because the defendant "would be prejudiced if the witnesses were permitted to testify with no opportunity to depose them," and "[a] continuance would not address this problem if, as the record indicates, the VA continued to prevent the doctors from being deposed." *Id*. Accordingly, the court granted the defendant's motions to strike the two VA doctors as witnesses. *Id*.

In *Milton*, the court struck a VA doctor's designation as plaintiff's expert witness because the court found that the "late disclosure was not substantially justified." *Milton*, 2005 WL 8161652, at *3. However, the court observed that "the

Federal Rules of Civil Procedure allow treating physicians to give expert testimony at trial without the requirement of a written report." *Id*. (citing Fed. R. Civ. P. 26, advisory committee's note to 1993 amendment ("A treating physician, for example, can be deposed or called to testify at trial without any requirement for a written report.")). The court further observed that "[t]he scope of the treating physician's opinion testimony at trial is not unlimited," and that "[t]he relevant question is whether these treating physicians acquire their opinions as to the cause of the plaintiff's injuries directly through their treatment of the plaintiff." *Id*. (internal quotation marks omitted). Further, the court observed that federal regulations, including 39 C.F.R. § 14.808(a), also limits the scope of a VA doctor's treating physician testimony at trial. *Id*.

The court held that "[p]ursuant to the Federal Rules of Civil Procedure, [the VA doctor] c[ould] give opinion testimony at trial concerning the cause of [the plaintiff's] medical condition, his diagnosis, the prognosis, and the extent of any disability caused by his condition," and that "[t]he untimely designation of [the VA doctor] as an expert does not prevent her from giving this testimony at trial." *Id*. The court further held that, pursuant to 38 C.F.R. § 14.808(a), the VA doctor was "prohibited from providing opinion or expert testimony at trial concerning official VA information, subjects, or activities, except on behalf of the United States[;] . . .

[t]herefore, [the VA doctor] c[ould] give testimony only in her capacity as a treating physician." *Id.* at *4.

Courts in this circuit have likewise concluded that VA doctors ordinarily cannot testify as expert witnesses. *See In re 3M Combat Arms Earplug Prods. Liab. Litig.*, No. 3:19-MD-2885, 2020 WL 6140561, at *6 (N.D. Fla. Oct. 19, 2020) ("[E]xpert or opinion testimony barred under § 14.808 . . . is a well-established restriction in the VA's *Touhy* regulations."); *Brown v. U. S. Dep't of Veterans Affs.*, No. 2:17-CV-1181-TMP, 2017 WL 3620253, at *8 n.11 (N.D. Ala. Aug. 23, 2017) ("To be clear, the court agrees that [the VA doctor] cannot be made to give expert or opinion evidence[, and] . . . [h]e will not be required to offer any testimony that calls for the use of any specialized knowledge, skill, or experience within the confines of Fed. R. Evid. 702.").

Ms. Staten responds that the Veterans Affairs' Office of General Counsel did not "finalize a denial of Dr. Fix" as a witness, but rather determined that "at th[e] time" of Federal's request for Dr. Fix's testimony, she was not authorized or required to comply with Federal's demand. Doc. 52 at 4, 12. In her response, Ms. Staten cites three cases from other jurisdictions: *Watts v. SEC*, 482 F.3d 501 (D.C. Cir. 2007); *COMSAT Corp. v. Nat'l Sci. Found.*, 190 F.3d 269 (4th Cir. 1999); *Exxon Shipping Co. v. U.S. Dep't of Interior*, 34 F.3d 774 (9th Cir. 1994). These cases discuss the standards that federal courts apply when parties seek judicial review of an agency's

decision not to authorize their employees to testify and/or produce documents in response to discovery requests in civil litigation. *See Watts*, 482 F.3d at 508 ("[A] challenge to an agency's refusal to comply with a Rule 45 subpoena should proceed and be treated . . . as a Rule 45 motion to compel."); *COMSAT Corp.*, 190 F.3d at 274 ("When the government is not a party, the APA provides the sole avenue for review of an agency's refusal to permit its employees to comply with subpoenas."); *Exxon Shipping Co.*, 34 F.3d 774 at 780 ("[D]istrict courts should apply the federal rules of discovery when deciding on [motions to compel] discovery requests made against government agencies [and their employees], whether or not the United States is a party to the underlying action."). The cases are inapposite because neither Federal, nor Ms. Staten, challenges the VA's objection that Dr. Fix is not authorized to testify as an expert witness in this case. Instead, Ms. Staten simply argues that Dr. Fix should be allowed to testify anyway.

In light of the persuasive authority cited in Federal's motion, *Munoz*, 2020 WL 4500603; *Cooper*, 662 F. Supp. 2d 757; *Milton*, 2005 WL 8161652, the decisions from courts in this circuit addressing expert testimony by VA doctors, *In re 3M Combat Arms Earplug*, 2020 WL 6140561; *Brown*, 2017 WL 3620253, the VA's conclusion that "Dr. Fix is not authorized to testify as an expert witness," Doc. 49-2 at 1, and the parties' failure to raise objections to that conclusion, Federal's request to exclude expert and opinion testimony from Dr. Fix and to strike the letter

attached to Ms. Staten's Expert Witness List, Doc. 49 at 6, is **GRANTED**. Accordingly, Ms. Staten's Expert Witness List, which contains an unredacted copy of the July 20, 2020 letter from Dr. Fix, Doc. 30, is **STRICKEN**.

Ms. Staten has filed multiple redacted copies of the July 20, 2020 letter from Dr. Fix. *See* Doc. 52 at 13; Doc. 54 at 9; Doc. 61-2 at 9; Doc. 72-1 at 62; Doc. 74 at 66. In that letter, Dr. Fix asserts that Mr. Staten's "precipitous decline and ultimate death was felt to be due to the fall [in December 2016]." Doc. 52 at 13. Federal asserts that any statements by Dr. Fix regarding "whether the December 2016 [fall] caused [Mr. Staten's] death in September 2017 . . . amount[s] to impermissible expert testimony." Doc. 49 at 8. But Federal does not assert that Dr. Fix's statements as Mr. Staten's treating physician regarding the cause of his death were not acquired through her treatment of Mr. Staten, nor does Federal show that the VA has prohibited Dr. Fix from testifying as a treating physician in this case. *See id.* Accordingly, at this stage of the litigation, the court will not strike the redacted copies of Dr. Fix's letter that Ms. Staten has filed on the record, and Federal's motion is **DENIED** in that regard.

### b. The Court Will Not Preemptively Limit the Scope of Any Potential Testimony from Dr. Fix as Fact Witness

Federal asserts that, "[w]hile the VA has not authorized Dr. Fix to testify as a fact witness in this case, Federal respectfully requests [that] the Court limit the scope of any potential testimony Dr. Fix may provide in the event th[at] Dr. Fix later is

permitted by the VA to testify, either with the VA's permission or by Court order."
Doc. 49 at 6–7. Federal asserts that "[a]ny testimony by Dr. Fix on whether the
December 2016 [fall] caused [Mr. Staten's] death in September 2017 would amount
to impermissible expert testimony" because "there is no evidence that Dr. Fix
specifically treated [Mr. Staten] for the fall." *Id*. at 8.

Ms. Staten responds that "Federal is mistaken in [its] effort to discredit Dr.
Fix['s] written statement dated July 20, 2020, which specifically relies on the
medical records," not upon any information provided to her by Ms. Staten. Doc. 52
at 8–9. Ms. Staten attached a redacted version of Dr. Fix's letter dated July 20, 2020,
to her response. Doc. 52 at 13. Further, Ms. Staten asserts that the Veterans Affairs'
Office of General Counsel did not "finalize a denial of Dr. Fix" as a witness, but
rather determined that "at th[e] time" of Federal's request for Dr. Fix's testimony,
she was not authorized or required to comply with Federal's demand. Doc. 52 at 4,
12. Finally, Ms. Staten asserts that, "if this case proceeds to trial[,] Dr. Fix will be
allowed to testify on behalf of the [decedent]." *Id*. at 10.

"Federal does not seek Dr. Fix's testimony as a fact witness, as the medical
records produced by the VA, which include records prepared by Dr. Fix, speak for
themselves." Doc. 49 at 6. Further, the VA has asserted that, because "neither party
has complied with federal regulations and provided [the VA Office of General
Counsel] with the information necessary to consider authorization" of Dr. Fix to

testify as a fact witness, such testimony is not authorized "at this time." Doc. 49-2 at 1.

Because the court has already found that Dr. Fix is precluded from providing expert testimony in this case, *see supra* at pp. 19–20, any testimony she may provide will be limited to testimony as a treating physician. At this stage and posture of litigation, the court will not preemptively limit the scope of any potential testimony of Dr. Fix as Mr. Staten's treating physician.

Accordingly, Federal's request for limitations on the scope of any testimony by Dr. Fix above and beyond the limitations ordered, *supra* at pp. 19–20, is **DENIED** as premature. If Federal wishes to renew its request during the pretrial phase of litigation, it may do so.

### 2. Ms. Staten's Motions to Exclude

Ms. Staten seeks to exclude portions of Federal's evidentiary submissions in support of its motion for summary judgment. Docs. 63 & 64. Specifically, Ms. Staten moves the court to exclude the Alabama Certificate of Death for Mr. Staten, Doc. 58-5, and the expert reports of Dr. Aaron Sylvan Lord, Doc. 58-11.

### a. Motion to Exclude Alabama Certificate of Death

The certifying physician listed in Mr. Staten's Certificate of Death is Dr. David Cherry. Doc. 58-5. Ms. Staten asserts that Dr. Cherry "never once came out to see" Mr. Staten, Doc. 63 ¶ 4, but she does not cite any evidence to support that

assertion. Ms. Staten further asserts that "[t]he cause of death . . . place[d] on [Mr.] Staten's death certificate had been pre-determined by Dr. David Cherry . . . on the same day that Oasis [Hospice Healthcare ("Oasis")] got involved with his care," *id.* ¶ 5, citing a "Hospice Recert Summary Report" for Mr. Staten that ordered the following on May 4, 2017: "ALLOW NATURAL DEATH," *id.* at 9. Ms. Staten also asserts that "on May 15, 2017, without seeing [Mr.] Staten or running any tests on him, [Dr. Cherry] changed his diagnostic" order code, *id.* ¶ 6, citing a "Physician Verbal Order" that changed Mr. Staten's primary diagnosis to "heart disease of native coronary artery," *id.* at 10. Ms. Staten accuses Dr. Cherry of changing the diagnostic code "to coincide with the beginning documentation of natural causes that he initiated upon admission," *id.* ¶ 6, but Ms. Staten does not cite any evidence to support that accusation. Finally, Ms. Staten asserts that, although Mr. Staten "died on September 6, 2017, [i]t wasn't until September 16, 2017 that Dr. Cherry signed his Death Certificate." *Id.* ¶ 8. Ms. Staten again asserts, with no evidentiary basis, that the "death certificate was decided on May 4, 2017." *Id.*

Further, Ms. Staten asserts that Oasis nursing staff filled out a VA form that listed Mr. Staten's fall as the cause of him "becom[ing] homebound and bedbound," and provided that Mr. Staten could not "remember to take his medication or be responsible for it" because he suffered a "Traumatic Brain Injury." *Id.* ¶ 7. Ms. Staten supports that assertion by reference to a VA form titled "Examination for

Housebound Status or Permanent Need for Regular Aid and Attendance," which form appears to be signed by or on behalf of Dr. Cherry. *Id*. at 11–12. Ms. Staten asserts that "[t]he nurses . . . were manipulating the records so that Medicare would pay for their services." *Id*. ¶ 7. Ms. Staten also asserts that Mr. Staten "was under Oasis Hospice Healthcare as a contract with Medicare," which "contracts are active for up to six . . . years" and that, "after June 7, 2017, [Mr. Staten] should no longer have been under Oasis Hospice [Healthcare]." *Id*. ¶ 10. Ms. Staten does not provide evidence that the nursing staff was manipulating records, nor does she provide evidence that, after June 7, 2017, Mr. Staten should not have been cared for by Oasis. Ms. Staten asserts that "[b]ecause of the multiple infractions caused by Dr. David Cherry and hidden by [Federal]," she moves to exclude Mr. Staten's Alabama Certification of Death. *Id*. at 5. Ms. Staten also asserts that Federal attached a copy of the death certificate to the motion for summary judgment, but that the death certificate "had not previously been submitted to the . . . Court." Doc. 63 ¶¶ 1–2. Ms. Staten does not cite to any statutes or case law to support her motion to exclude the death certificate, nor does she provide any legal argument for such exclusion. *See id*.

Federal responds that Ms. Staten's assertion that the death certificate should be excluded because Federal did not submit it to the court prior to filing the motion for a summary judgment fails because the local rules of this court prohibit the filing of discovery materials, except in connection with a motion, and in any event, Ms.

Staten included the death certificate in her January 2018 claim submission to Federal. Doc. 66 at 3.

Under Local Rule 5.3, "[d]iscovery materials in civil cases shall not be filed with the court." There are three exceptions: Discovery materials "shall be filed (1) in cases in which there is a pro se party; (2) when otherwise directed by a judge of the court; or (3) when and to the extent needed by a party in connection with any motion, response to a motion, or during trial." L.R. 5.3. Because Federal is not a *pro se* party, its understanding was that it was not required to file all discovery materials with the court. Doc. 66 at 3 n.2. Nor was Federal expressly ordered to file discovery materials. Indeed, under Local Rule 5.3, Federal was prohibited from filing discovery material with the court "except . . . when and to the extent needed by [it] in connection with [its] motion" for a summary judgment. And in any event, Federal is correct that Ms. Staten cannot assert that she was surprised by the filing of the death certificate with Federal's motion for summary judgment, because she was the original source of that document for Federal.

As to Ms. Staten's assertion that the death certificate should be excluded due to certain "infractions" by Dr. Cherry and manipulation of records by Oasis staff, *see* Doc. 63 at 4–5, Federal asserts that "[t]hese allegations are not supported by any evidence and/or do not provide a sufficient basis to exclude from evidence [Mr.] Staten's death certificate," Doc. 66 at 5. Federal further asserts that Dr. Cherry

"participated in 11 interdisciplinary group meetings . . . to discuss [Mr.] Staten's condition," and that "Medicare regulations governing hospice facilities do not require face-to-face encounters between the patient and hospice physicians/nurse practitioners until the patient's stay in hospice is anticipated to reach . . . beyond 180 days." *Id*. at 6–7 (citing 42 C.F.R. §§ 418.21(a), 418.22(a)(4)(i)) (internal quotation marks omitted). Federal also asserts that "Dr. Cherry was authorized to certify [Mr.] Staten's death certificate as his 'Secondary Physician' and as Oasis' Medical Director." Doc. 66 at 7 (citing Ala. Code § 22-9A-14(c)). Finally, Federal asserts that "[a] party cannot strike evidence simply because it does not like what the evidence says," and that "[t]he proper method for challenging Federal's substantive position as to the cause of death is in response to Federal's summary judgment motion." Doc. 66 at 7.

*First*, under the applicable regulations, a face-to-face encounter with a hospice physician or hospice nurse practitioner was not required before Mr. Staten's death. Under 42 C.F.R. § 418.21(a), "an individual may elect to receive hospice care during one or more of the following election periods: (1) An initial 90–day period; (2) A subsequent 90–day period; or (3) An unlimited number of subsequent 60–day periods." Such "periods of care are available in the order listed and may be elected separately at different times." 42 C.F.R. § 418.21(b). Further, under 42 C.F.R. § 418.22(a)(4)(i), "a hospice physician or hospice nurse practitioner must have a face-

to-face encounter with each hospice patient whose total stay across all hospices is anticipated to reach the 3rd benefit period." Such "face-to-face encounter must occur prior to, but no more than 30 calendar days prior to, the 3rd benefit period recertification . . . to gather clinical findings to determine continued eligibility for hospice care." Thirty calendar days before the third benefit period is approximately 150 days of hospice stay. Mr. Staten's hospice stay began in early May 2017, Doc. 63 at 2, 7, and his death occurred on September 6, 2017, *id*. ¶ 3, which would have been less than 150 days after he was admitted to hospice care.

*Second*, to the extent Ms. Staten asserts that Dr. Cherry was not authorized to certify Mr. Staten's death, she has not shown that Dr. Cherry, as the Medical Director at Oasis, did not have such authority under Alabama law. Under Alabama Code Section 22-9A-14(c), "[t]he physician in charge of the care of the patient for the illness or condition that resulted in death shall complete and sign the medical certification," but "[i]n the absence of the physician, the certificate may be completed and signed by another physician designated by the physician."

Section § 22-9A-14(c) also provides that the physician certifying the death "shall complete and sign the medical certification and transmit the certificate to the Office of Vital Statistics in the manner directed by the State Registrar, within 48 hours **after receipt of the certificate**." Ala. Code § 22-9A-14(c) (emphasis added). Ms. Staten asserts that Mr. Staten "died on September 6, 2017," but "[i]t wasn't until

September 16, 2017 that Dr. Cherry signed his Death Certificate,"[5] Doc. 63 at 4, but she has not shown that Dr. Cherry failed to sign and transmit the certificate within two days after he received the certificate. Indeed, Ms. Staten does not reference any evidence on record showing when Dr. Cherry received the certificate or that he did not comply with the forty-eight-hour requirement under Section 22-9A-14(c).

*Third*, under Federal Rule of Evidence 803, "[a] record of a . . . death, . . . if reported to a public office in accordance with a legal duty," is not "excluded by the rule against hearsay, regardless of whether the declarant is available as a witness." Fed. R. Evid. 803(9). Ms. Staten has not shown that the death certificate was not "reported to a public office in accordance with a legal duty," Fed. R. Evid. 803(9), nor has she provided the court with any other applicable rules or laws that would support her request to exclude the death certificate from evidence.

Further, "[a]lthough Alabama law presumes as true the cause of death stated in a death certificate, this is a rebuttable presumption." *Tate v. Gov't Emps. Ins. Co.*, 997 F.2d 1433, 1437 (11th Cir. 1993) (citing *Liberty Nat. Life Ins. Co. v. Reid*, 158 So. 2d 667, 675 (Ala. 1963) ("[A] physician's certificate as to cause of death, while considered prima facie true is conclusive only if unrebutted.")). Although Ms. Staten asserts that Dr. Cherry committed "multiple infractions" regarding his certification

---

[5] The death certificate provides that the date of death was on September 6, 2017, and that Dr. Cherry signed the medical certification on September 19, 2017. Doc. 58-5.

of Mr. Staten's death from "Natural Causes," and may rebut such certification under Alabama law, she does not provide support for her assertion that the death certificate should be excluded from evidence altogether.

For the foregoing reasons, Ms. Staten's motion to exclude the Alabama Certificate of Death for Mr. Staten, Doc. 58-5, is **DENIED**.

### b. Motion to Exclude Dr. Lord's November 13, 2020 Expert Report

Ms. Staten further moves the court to exclude the expert reports of Dr. Aaron Sylvan Lord, asserting that "those instruments . . . [were] purposely withheld from her until the 13th day of January 2021, and then delivered to this Court as unrebutted, in [Federal's] attempt to manipulate and . . . use prejudic[ial] tactics as [Federal] continuously and wantonly committed fraud upon [her] through [its] paid Expert Witness, Dr. Aaron Sylvan Lord." Doc. 64 at 1. Specifically, Ms. Staten asserts that Federal "withheld [Dr. Lord's] statement until [it] filed [its] Motion for Summary Judgment" and "falsely stat[ed] that the unseen statement was unrebutted." *Id*. ¶ 5. Ms. Staten asserts that Federal was "very intentional in [its] efforts to withhold Dr. Lord's letter . . . dated November 13, 2020," and that Federal "chose not to file it," but "instead place[d] it to the back of over thirty . . . [e]xhibits" to its motion for a summary judgment that are "ripple[d] with false statements and misrepresentations." *Id*. ¶ 4.

Further, Ms. Staten asserts that Federal "fail[ed] to provide [her] with the actual copies of the Head CT's film/pictures that were reportedly viewed by [Dr. Lord] in his November 13, 2020 letter[, in] which he states [that he] . . . specifically used [such images] to determine that [Mr. Staten] died from natural causes." *Id*. ¶ 2. Ms. Staten also asserts that Federal "neglect[ed] to provide [its] own paid Expert Witness . . . with the photographs that were taken of [Mr. Staten's] swollen head after his injury o[n] December 23, 2016." *Id*. ¶ 3. Ms. Staten asserts that "[t]hese are pertinent facts that have not been discussed in the assessment of Dr. Lord . . . and shall cause some serious prejudices if allowed to go unchallenged and unrebutted." *Id*. Ms. Staten also asserts that Dr. Lord relied on "Baptist Princeton Hospital Records . . . [and a] limited amount of medical history . . . on the insured," which caused Dr. Lord "to develop a prejudice[d] view." *Id*. ¶ 7. Ms. Staten further asserts that Federal sent Dr. Lord a letter that Ms. Staten wrote to Dr. Cherry regarding Mr. Staten's death certificate, as well as the July 20, 2020 letter from Dr. Fix, which use of those documents was "entirely prejudicial." *Id*. ¶ 6. Ms. Staten asserts that, although "Dr. Lord mentions [Dr. Fix's letter] in his assessment," the letter was not attached as an exhibit to Federal's motion for a summary judgment. *Id*.

Ms. Staten argues that Federal "desire[d] to allow [its] Expert Witness . . . to testify on . . . the nature and severity of [Mr. Staten's] brain injury, claiming that [Mr. Staten] had none, . . . [w]hile [Federal was] aware that all of [Dr. Lord's]

testimony is pure conjecture." *Id*. at 5. Ms. Staten asserts again that Federal "waited until [it] filed [its] Summary Judgment Motion to submit false claims such [as] unrebutted expert testimony," and that she "inquire[d] about her having the opportunity of deposing [Dr. Lord], which [defense counsel] personally refused[,] saying that he did not need that deposition." *Id*. at 6. Finally, Ms. Staten again asserts that Dr. Lord failed to "discuss[] in the assessment" certain "pertinent facts" regarding brain injuries, and that such failure "causes some very serious prejudices . . . if not excluded." *Id*. at 7. Ms. Staten does not cite to any statutes, case law, or rules to support her motion to exclude Dr. Lord's reports from the evidence. *See id*.

Federal responds that "Dr. Lord's expert reports were provided to [Ms. Staten] prior to Federal submitting its summary judgment motion and evidentiary submission." Doc. 66 at 3. Specifically, Federal asserts that its "counsel emailed Dr. Lord's first report to [Ms. Staten] on September 30, 2020," but Ms. Staten "informed Federal['s] counsel on November 6, 2020 that her email had been hacked and she had difficulties accessing her email" and "that postal delays prevented her from timely receiving mail." *Id*. at 4. "Federal['s] counsel coordinated multiple hand deliveries of its written discovery production to [Ms. Staten's] residence in Fultondale, Alabama, scheduled for times when [Ms. Staten] confirmed she would be home." *Id*. Federal asserts that "[o]ne of the hand deliveries on November 24, 2020 included a CD from Princeton Hospital containing imaging from [Mr.] Staten's

brain scan and a flash drive containing 16 PDFs, two of which were Dr. Lord's expert reports." *Id*. Federal asserts that it went "to extraordinary lengths to ensure [Mr. Staten] timely received discovery-related documents," *id*, but it does not provide any evidence showing that the brain scans and expert reports were delivered to Ms. Staten. *See id*.

Ms. Staten's reply does not contest that Federal hand-delivered the brain scans and both expert reports on November 24, 2020. Because Ms. Staten does not provide evidence to support her assertion that she was not provided the expert reports before Federal filed them in connection to the motion for a summary judgment, Ms. Staten has not shown that Federal failed to disclose its expert witness and report to her in compliance with the court's Scheduling Order, Doc. 29, and Federal Rule of Civil Procedure 26(a)(2).

Further, because Dr. Lord reviewed the CT scans of Mr. Staten's head on December 23, 2016, *see* Doc. 58-11 at 12, as well as other evidence and medical records for Mr. Staten, *see id*. at 1–2, 12, the court finds that Dr. Lord's report should not be excluded based on his failure to review "the photographs that were taken of [Mr. Staten's] swollen head after his injury o[n] December 23, 2016," *see* Doc. 64 ¶ 3. Nor should Dr. Lord's expert report be excluded because he reviewed records from Baptist Princeton Hospital, Ms. Staten's letter to Dr. Cherry regarding the certificate of death, and the July 20, 2020 letter from Dr. Fix, as Ms. Staten does not

provide evidentiary support for her assertion that his review of such documents were improper or prejudicial. Indeed, Ms. Staten has not provided the court with any case law or rules that (1) require an expert to review each piece of evidence produced by the parties during the litigation, or (2) prevent a defendant's expert witness from reviewing certain medical records produced during the litigation, or documents that the plaintiff has produced and/or filed on the record.

That Federal did not attach Dr. Fix's letter to its motion for summary judgment also does not support the exclusion of Dr. Lord's report because Dr. Fix's letter was already in the record and was in Ms. Staten's possession at the time Dr. Lord's report was filed in connection with Federal's motion for a summary judgment.

Ms. Staten's assertion that the expert report should be excluded because it is based on "pure conjecture," Doc. 64 at 5, fails because she does not support such assertion with any evidence, or any applicable law or rules. Further, the Eleventh Circuit has "repeatedly stressed . . . that the gatekeeping function under Rule 702 is not intended to supplant the adversary system or the role of the jury: vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Adams v. Lab'y Corp. of Am.*, 760 F.3d 1322, 1334 (11th Cir. 2014) (internal quotation marks omitted) ("[S]hakiness goes to the weight of [the expert's] testimony, not its admissibility."). Because Ms. Staten does not raise admissibility

objections pursuant to Federal Rule of Evidence 702 in her motion to exclude Dr. Lord's expert report, and because the "shakiness" of Dr. Lord's report should be considered by a jury, the court will not exclude Dr. Lord's report based on Ms. Staten's conclusory assertion that it is "pure conjecture."

Finally, Federal asserts that its "counsel never directed or advised [Ms. Staten] regarding any aspect of her litigation strategy," and "never 'refused' to allow [Ms. Staten] to depose Dr. Lord." Doc. 66 at 10. Federal asserts that "[h]ad [Ms. Staten] desired to depose Dr. Lord . . . , Federal['s] counsel would have worked with [Ms. Staten] to facilitate th[at] deposition[]." *Id*. Ms. Staten's reply does not contest these assertions. *See* Doc. 71. Because Ms. Staten does not provide any evidence to support her assertion that Federal's counsel refused her request to depose Dr. Lord, the export report will not be excluded on that basis.

For the foregoing reasons, Ms. Staten's motion to exclude Dr. Lord's expert report is **DENIED**.

## B. Federal's Motion for Summary Judgment

Federal asserts that "[t]he Court should grant summary judgment to Federal on both of [Ms. Staten's] claims," arguing that (1) "[t]he breach of contract claim fails because [Ms. Staten] can never satisfy her burden of proving coverage under the Policy," and (2) "[t]he bad faith claim also fails" because "Federal . . . tried for over a year to get [Ms. Staten] to provide medical records, but [she] never provided

sufficient records to enable Federal to make a coverage determination as to whether Walter Staten's death was accidental." Doc. 60 at 4.

### 1. Breach of Contract

When a district court exercises jurisdiction over state-law claims, "state law governs substantive issues and federal law governs procedural issues." *McDowell v. Brown*, 392 F.3d 1283, 1294 (11th Cir. 2004) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)); *see also Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1259 (11th Cir. 2015) ("[W]hen federal courts are sitting in diversity or pendent jurisdiction only substantive state law must be applied, while federal law governs matters of procedure." (internal quotation marks omitted)). "This principle extends to the forum state's conflicts of law rules." *LaFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511, 1515 (11th Cir. 1997) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)); *accord Travelers Prop. Cas. Co. of Am. v. Moore*, 763 F.3d 1265, 1270 (11th Cir. 2014). Accordingly, Alabama's choice-of-law rules determine the substantive law that controls the breach of contract claim.

"Alabama applies the traditional doctrine[] of *lex loci contractus* to contract claims . . . ." *Colonial Life & Acc. Ins. Co. v. Hartford Fire Ins. Co.*, 358 F.3d 1306, 1308 (11th Cir. 2004); *accord Blalock v. Sutphin*, 275 So. 3d 519, 523 (Ala. 2018). "The doctrine of *lex loci contractus* governs the validity, interpretation, and

construction of the contract." *Colonial Life*, 358 F.3d at 1308. That doctrine provides that "a contract is governed by the laws of the state where it is made except where the parties have legally contracted with reference to the laws of another jurisdiction." *Id.* (internal quotation marks omitted). Another exception to the *lex loci contractus* rule is that it does not apply "where the law of a foreign state is contrary to Alabama's fundamental public policy." *Cherokee Ins. Co. v. Sanches*, 975 So. 2d 287, 294 (Ala. 2007) (internal quotation marks omitted) (alterations accepted).

The parties do not indicate where the contract at issue was made, and they did not provide a choice-of-law analysis in their briefs. Nevertheless, because both parties applied Alabama law to the contract claim, the court will likewise apply the law of the forum state (Alabama). *See Int'l Ins. Co. v. Johns*, 874 F.2d 1447, 1458 n.19 (11th Cir. 1989) (observing that "because [among other things] the parties failed to consider the choice of law in this diversity case, [the Eleventh Circuit] must presume that the substantive law of the forum . . . controls").

Insurance policies containing accidental death benefits generally "contain[] two relatively standard clauses: (1) a general clause providing recovery for injuries caused directly and exclusively by external . . . and accidental means; and (2) an additional clause excluding benefits for loss resulting directly or indirectly, wholly or partly, by disease or bodily or mental infirmity." *Metro. Life Ins. Co. v. Nichols*, 393 So. 2d 966, 967 (Ala. 1981).

"[P]olicy language . . . contained in [a] 'general clause' has been construed to mean that if the accident aggravated a disease and hastened the death of the insured, the accident is yet considered the proximate cause of the insured's death, notwithstanding the gravity of the disease or that the accidental injury would not have been fatal but for the infirmity." *Id.* (internal quotation marks omitted). Alabama law applies a chain reaction theory when a policy contains an "additional clause," which theory provides that:

> Alabama courts, and this Court, take a more reasonable view regarding the additional clause. If an insured has an active disease of such a character as to endanger the insured's life, apart from the accident, such a disease is a contributing cause that will bar recovery. *If however an injury starts a chain reaction resulting in death, recovery may be allowed even if one of the links in the chain is old age frailty and some of the links are dormant diseases or physical conditions without which the chain would be broken.*

*Collins*, 729 F.2d at 1405 (internal quotation marks omitted) (alterations accepted) (emphasis in *Collins*). "[W]here the policy contains the 'additional clause' then no recovery can be had where death results from the combined effects of an accident and a pre-existing disease which was accelerated and aggravated by the accident." *Nichols*, 393 So. 2d at 967 (internal quotation marks omitted). But "[i]f an injury starts a chain reaction resulting in death, recovery may be had even if one of the links in the chain is old age, frailty and some links are dormant diseases or physical conditions without which the chain would be broken." *Id.* (internal quotation marks omitted). Further, "where the evidence is conflicting as to whether an accident was

the cause of an insured's death, or whether the accident and a disease cooperating therewith combined to cause death, then ordinarily a question of fact within the resolution of the trier of fact is presented." *Id*. (internal quotation marks omitted). "The general rules of construing insurance policies favorably to the insured apply to these clauses," and "[e]ach case must be particularized." *Id*.

Mr. Staten's insurance policy with Federal contains a "general clause" and an "additional clause." Specifically, the policy provides that Federal "will pay up to the applicable Benefit Amount . . . if an Accident occurring anywhere in the world results in a loss not otherwise excluded," and that "[t]he Accident must result from a covered circumstance and . . . [t]he Loss must occur within one (1) year of the Accident." Doc. 56-1 at 3. (emphasis omitted). The policy defines "Accident" as "a sudden, unforeseen, and unexpected event which happens by chance, arises from a source external to the Covered Person, is independent of illness, disease or other bodily malfunction and is the direct cause of loss." *Id*. at 9 (emphasis omitted). The policy further provides that it "does not apply to any Accident, Accidental Bodily Injury or loss caused by or resulting from, directly or indirectly, a covered Person's emotional trauma, mental or physical illness, disease, . . . bacterial or viral infection, bodily malfunctions, or medical, surgical or diagnostic treatment thereof." *Id*. at 8 (emphasis omitted).

Federal asserts that "[t]he Federal policy death benefit is not owed under the facts of this case because there is no evidence Walter Staten's October 31, 2016 and/or December 23, 2016 falls had any causal connection to his September 6, 2017 death" and, "even if those falls contributed in some fashion to his death nine months later, the combined effect of those falls and his significant pre-existing diseases mean[s] no recovery can be had." Doc. 60 at 26 (internal quotation marks omitted).

### a. Death Certificate as *Prima Facie* Evidence of Causation

Federal asserts that "[c]ertified 'registers of . . . deaths . . . kept in pursuance of law . . . are presumptive evidence of the facts therein stated.'" *Id*. at 26 (quoting Ala. Code § 12-21-101) (alterations accepted). Federal asserts that "[t]he certifying physician who completed [Mr.] Staten's death certificate attested to 'Natural Causes' as the manner of death and 'Atherosclerotic Heart Disease' as the immediate cause of death, with no underlying causes." *Id*. (quoting Doc. 58-5). Federal argues that Ms. Staten "fails to provide sufficient medical evidence to overcome the presumptive cause of death listed on [Mr.] Staten's certified death certificate or the extensive medical records indicating he did not die by accidental means." *Id*. at 27–28.

Because a death certificate "has only prima facie effect as to the facts stated therein," a "plaintiff ha[s] the right to try to contradict the facts as stated in the death certificate." *Union Cent. Life Ins. Co. v. Scott*, 236 So. 2d 328, 334 (Ala. 1970); *see*

*also Reid*, 158 So. 2d at 675 ("[A] physician's certificate as to cause of death, while considered prima facie true is conclusive only if unrebutted."). Because Ms. Staten has presented evidence that contradicts the facts stated in the death certificate through the July 20, 2020 letter from Dr. Fix, which provides that Mr. Staten's "ultimate death was felt to be due to the fall [in December 2016]," Doc. 72-1, this evidence presents a question for a jury. *See Tate*, 997 F.2d at 1440 (observing that "Alabama courts give weight to the testimony and expectations of the insured and family members," and that such testimony alone could create a jury question).

Viewing the evidence in the light most favorable to Ms. Staten, the court finds that Ms. Staten has presented evidence to rebut the facts contained in Mr. Staten's death certificate. Accordingly, Federal's motion for a summary judgment on the basis that Ms. Staten failed to overcome the presumed cause of death listed on Mr. Staten's death certificate fails.

### b.  "Chain Reaction" Theory of Recovery

In support of its assertion that no evidence supports a chain reaction theory of recovery, Federal cites two cases from this Circuit: *Collins v. Metropolitan Life Insurance Co.*, 729 F.2d 1402 (11th Cir. 1984); and *Barron v. Amex Assurance Co.*, No. 2:14-CV-1095-WKW-PWG, 2016 WL 3678995 (M.D. Ala. June 16, 2016), *report and recommendation adopted sub nom. Barron v. Amex Insurance Co.*, 2016 WL 3677149 (M.D. Ala. July 11, 2016).

In *Collins*, the decedent was employed at a correctional facility, where another employee combined certain cleaning chemicals that began to emit fumes and "ordered an inmate to take the mixture through the back door and outside the building." *See Collins*, 729 F.2d at 1403. When the decedent left work around the same time the mixture was taken outside, he left through the back door where the mixture was taken. *Id*. Soon after the decedent left through the back door, "he was taken to the dispensary and from there to the local hospital, where he was pronounced dead on arrival." *Id*.

The decedent was an asthmatic and, in the ten years before his death, he was "hospitalized 4 times and treated in the emergency room approximately 10 times for his condition." *Id*. In the months leading up to his death, he was diagnosed with irreversible "chronic obstructive pulmonary disease," which disease was "such that he was at risk to die any time, even without inhalation of a known irritant." *Id*. The decedent's death certificate "stated that the cause of death was 'Cardio Pulmonary Arrest due to, or as a consequence of, Asthma.'" *Id*. at 1403–04.

The Eleventh Circuit affirmed the lower court's decision not to charge the jury about a chain reaction theory, reasoning that the lower court "properly concluded that no evidence existed . . . to support a finding of dormancy" because "[w]hile [the decedent] may not have been hospitalized for 2 months prior to his death on October 15, the record shows that in early October he had suffered an asthma attack at work[,]

41

. . . was under constant medication for his disease and . . . [, p]erhaps most importantly, his own personal physician had concluded that his disease was such that he was at risk to die any time." *Id*. at 1405.

In *Barron*, the decedent was taken to the hospital after she "was found lying on her bed with extreme weakness, shortness of breath, metal confusion, and no ability to walk." *Barron*, 2016 WL 3678995, at *3. At the hospital, a chest x-ray was taken and "revealed evidence of severe Chronic Obstructive Pulmonary Disease ('COPD') as well as Congestive Heart Failure ('CHF')," and notes "reflected that [the decedent] was unable to stand and was unable to use a walker to ambulate." *Id*. A few days later, the decedent was discharged from the hospital and transferred to a long-term care facility. *Id*. Less than a month later, the decedent "fell and fractured her right hip, neck, and right wrist;" the "hip fracture was surgically repaired" and "[h]er other fractures were treated through nonoperative management." *Id*. at *4 (internal quotation marks omitted). Because she did not experience complications from the surgery, she was discharged and transferred back to the long-term care facility. *Id*.

A little over a month after she was transferred back to the long-term care facility, the decedent died at the age of seventy-three. *Id*. The decedent's death certificate "listed her immediate cause of death as being due to a right hip fracture, with an 'approximate interval between onset and death' of six weeks," and her

"underlying or contributory causes of . . . death" as "COPD (with an interval between onset and death of ten years) followed by coronary heart disease (with an interval between onset and death of five years[)]." *Id*. The death certificate further provided that the decedent's "injury occurred by falling while getting out of bed into a wheelchair at [the long-term care facility]." *Id*. The certificate provided that the "Manner of Death" was by "Accident." *Id*.

The district court concluded that "[n]one of the medical evidence presented establishes that a chain reaction starting from the time [the decedent] fell and broke her hip proximately caused her death." *Id*. at *8. The court distinguished the facts of the case from other "cases where an accident was determined to be the proximate cause of death under a 'chain reaction' theory," because the plaintiffs in those other cases "successfully introduced expert medical evidence to show that trauma due to an accident was the cause of death and that other health conditions were truly dormant." *Id*. at *12. The court held that, "[i]n contract, the expert medical evidence adduced in this case is uncontradicted and demonstrates that [the decedent's] serious COPD and CHF were active medical conditions requiring medications prior to her falling down and fracturing her hip." *Id*. The court further held that "even if some or all of [the decedent's] medical conditions could be viewed as dormant, [the plaintiff] . . . identified no expert medical opinion to suggest that [the decedent's] fall was the trigger that activated any of the diseases," and that the decedent "became ill and died

six weeks after fracturing her hip does not by itself demonstrate that her fall caused a 'chain reaction' leading to her death." *Id*.

Ms. Staten asserts that she has "massive amounts of medical evidence to support [a] 'chain reaction' recovery theory," and references Dr. Fix's letter dated July 20, 2020, which provides among other things that Mr. Staten's "precipitous decline and ultimate death was felt to be due to the [December 2016] fall." Doc. 72 at 64. Throughout her response, Ms. Staten cites two cases that apply the chain reaction theory: *New York Life Ins. Co. v. McGehee*, 260 F.2d 768 (5th Cir. 1958),[6] and *Reid*, 158 So. 2d 667.

In *McGehee*, while "going from his bed to a chair with the help of his wife," the decedent "fell and skinned a knee." 260 F.2d at 769. Because "[t]he abrasion would not heal," the decedent "was hospitalized." *Id*. Acute cellulitis developed, which is an "infection of the skin and tissue," and the decedent's attending physician "said that the cellulitis was the worst case he had ever seen." *Id*. The cellulitis sent the decedent's "blood count to more than twice the normal count," and he ran a high fever and had trouble breathing. *Id*. The decedent's legs swelled and his heart weakened. *Id*. Sixteen days after the fall, he died at age seventy-seven of heart failure. *Id*.

---

[6] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit Court of Appeals entered before October 1, 1981.

The decedent's autopsy report stated that his death was "attributed to heart failure with the heart disease being on an arteriosclerosis and probably hypertensive basis." *Id*. (internal quotation marks omitted). The death certificate "gave arteriosclerotic heart disease and coronary artery disease as the 'Diseases or Conditions Directly Leading to Death and Antecedent Causes.'" *Id*. The death certificate also provided under the "Accident, Suicide, Homicide" heading that the decedent "[f]ell abraiding right knee." *Id*. at 770. The decedent's attending physician filled out the death certificate and later testified that "he equated the accident with suicide and homicide," and testified that "germane to this death and essential to it was the accident." *Id*. at 770 n.3. He further testified that, although the decedent "had things a man 77 years old has . . . , as there would be in anybody," he "would not have died had he not had the accident and the infection." *Id*.

The Fifth Circuit observed that "[a] review of the cases and the decisions of this Court shows that considerable latitude must be allowed [for] the jury in determining the question of causation." *Id*. at 772. The court further observed that, in cases involving "elderly people . . . it is difficult to separate the effects of the accident from the effects of disease." *Id*. In holding that "it seems to [the court] on a close reading of the record that the evidence makes a case for the jury," the Fifth Circuit highlighted that the decedent's attending physician told his wife "that her

husband could live ten years" and that his medical record did not contain issues "unusual in a man of seventy-seven." *Id*. at 773.

In *Reid*, the decedent slipped in the bathtub and, when his son found him, "his head [was] under the faucets" and he "had a bleeding gash over one eye." 158 So. 2d at 669–70. He was taken to the local hospital where "medicines were applied to the burns and [the decedent] was bandaged to the extent that he looked like a mummy." *Id*. at 670 (internal quotation marks omitted). Later that day, the decedent "was flown by an airplane ambulance to Foundation Hospital in New Orleans," where "several doctors and surgeons attended him." *Id*. The decedent died that same night. *Id*.

Prior to the accident, the decedent's medical records "showed evidence of heart disease," and that he had been diagnosed with "a partial heart block, which had become complete by October 1959." *Id*. at 669. The heart block caused the decedent to have Adams-Stokes syncope, which caused him to suffer "one or more fainting spells." *Id*. Nevertheless, "up until the day of his death," the decedent was engaged in a large law practice, was president of the county bar association, and participated in many civil enterprises. *Id*.

The death certificated listed "Adams-Stokes syndrome as the principal cause of death, with the syndrome being due to . . . gastrointestinal hemorrhage, and . . . burns." *Id*. at 671. "Numerous medical records . . . were received in evidence," and

a number of doctors testified by deposition. *Id*. at 670. The doctors were not in agreement "with their conclusions and findings as to the cause of Mr. Reid's death." *Id*. at 672. Indeed, one of the doctor's testimony "that [the decedent's] heart condition was not a cooperating and efficient cause of death [wa]s in conflict . . . with the evidence of [the other doctors]." *Id*. at 674. The Alabama Supreme Court observed that "[w]here the evidence is conflicting as to whether an accident was the cause of an insured's death, or whether the accident and a disease cooperating therewith combined to cause death, then ordinarily a question of fact within the resolution of the trier of fact is presented." *Id*. Accordingly, the court held that the testimony of the sole disagreeing doctor was "in its import . . . clear and substantial," and "fully support[ed] the conclusion of the trier of fact" that the beneficiary of the decedent was entitled to benefits under the accidental death policy. *Id*. at 668, 674.

Mr. Staten's death certificate provides that the "manner of death" was "Natural Causes" and that the "immediate cause" of death was "Atherosclerotic Heart Disease of Native Coronary Artery." Doc. 58-5. Further, in his expert report, Dr. Lord states that "[i]t is my opinion, within reasonable medical certainty, that Mr. Staten died of atherosclerosis of his heart and of his brain," and "[t]here is no evidence to suggest that the falls in October or December led to his death." Doc. 58-11 at 5. Dr. Lord's report further states that Mr. Staten's falls on October 31, 2016 and December 31, 2016, "would not have accelerated his death from atherosclerosis"

and that, "[h]ad the falls led to his decline[,] he would have [been] expected to have some significant neurological decline or symptoms at the time of the event, which are not present in the medical records." *Id*. at 5–6. Further, Dr. Lord's supplemental expert report provides that, in his review of Mr. Staten's head CTs and reports, "there is no evidence of acute traumatic brain injury on any of the images . . . [or] in the reports." *Id*. at 12. Dr. Lord states that, "[h]ad Mr. Staten died of a traumatic brain injury, there would be evidence of traumatic brain injury on his CT scans, and there is not." *Id*. Dr. Lord also states that, although Mr. Staten did "appear to have significantly worsened between April and July of 2017, . . . we do not see such delayed decline due to a fall without having significant symptoms or signs at the time of the event." *Id*. at 6. Dr. Lord does not opine as to the cause of Mr. Staten's worsening health. *Id*.

In Dr. Fix's letter, she states that she began seeing Mr. Staten as a patient in July 2017, which was after he had been admitted to hospice care. Doc. 72-1 at 62. She states that Mr. Staten "suffered a fall in December 2016 and hit his head" and that, "[a]fter the fall," Mr. Staten's "health began to decline significantly . . . and his memory was significantly impaired." *Id*. Dr. Fix further states that, following that fall, "he was not able to get out of bed, walk, [or] feed himself." *Id*. Dr. Fix states that she "review[ed] his VA records prior to the fall and in August 2016 he was able to walk with a walker, feed himself, converse normally and was continent of bladder

and bowel." *Id*. Finally, although Dr. Fix notes that Mr. Staten had "preexisting diagnoses of diabetes, chronic pancreatitis and heart disease . . . , his precipitous decline and ultimate death was felt to be due to the fall." *Id*.

This case is distinguishable from the two cases cited by Federal. Here, unlike in *Collins*, Federal has not presented evidence that Mr. Staten's doctors had concluded that his preexisting diseases put him at risk of death at any time. Further, this case is like *Barron* in that Ms. Staten does not have a medical expert to support her claims, but distinguishable from *Barron* because Ms. Staten produced a letter from Dr. Fix, a treating physician, indicating that Mr. Staten's fall may have been the cause of his death. *See Barron*, 2016 WL 3678995, at *6 ("The Alabama Supreme Court . . . does not hold . . . that Plaintiff's failure to name a medical expert automatically precludes him from meeting his burden of proof in an action seeking accidental death benefits.").

Here, like in *McGehee*, the conflicting evidence on the record presents a question of causation for the jury. 260 F.2d at 772 ("[C]onsiderable latitude must be allowed [for] the jury in determining the question of causation."). Indeed, as was held in *Reid*, "[w]here the evidence is conflicting as to whether an accident was the cause of an insured's death, or whether the accident and a disease cooperating therewith combined to cause death, then ordinarily a question of fact within the resolution of the trier of fact is presented." *Reid*, 158 So. 2d at 674.

For the foregoing reasons, Federal's motion for a summary judgment on the basis that there is no genuine dispute as to any material fact regarding a chain reaction theory of recovery for accidental death benefits fails. Accordingly, Federal's motion for summary judgment on the contract claim is **DENIED**.

### 2. Bad Faith

Under Alabama law, the tort of bad faith failure to pay an insurance claim "has four elements plus a conditional fifth element[:]"

> (a) an insurance contract between the parties and a breach thereof by the defendant; (b) an intentional refusal to pay the insured's claim; (c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason); (d) the insurer's actual knowledge of the absence of any legitimate or arguable reason; (e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.

*State Farm Fire & Cas. Co. v. Brechbill*, 144 So. 3d 248, 257 (Ala. 2013) (internal quotation marks omitted). "Even if [the insurer] improperly omitted some aspects of a complete investigation, more than bad judgment or negligence is required in a bad-faith action." *Id*. at 259 (internal quotation marks omitted). "A bad-faith-refusal-to-investigate claim cannot survive where the trial court has expressly found as a matter of law that the insurer had a reasonably legitimate or arguable reason for refusing to pay the claim at the time the claim was denied." *Id*. at 260.

Federal asserts that it "never actually denied Plaintiff's claim," but "[i]nstead . . . closed its file after 15 months' worth of attempts to obtain medical records relating to [Mr.] Staten's falls." Doc. 60 at 33 (citing Doc. 58-10 at 24–25). Federal further asserts that "[t]he only records [Ms. Staten] submitted to Federal relating to direct medical treatment for his October 2016 and December 2016 falls were three pages of discharge instructions for [Mr. Staten's] October 31, 2016, November 4, 2016, and December 23, 2016 ER visits." *Id*. (citing Doc. 59-1 at 120–122; Doc. 56-2 at 1; Doc. 56-3 at 12; and Doc. 56-5 at 15). Federal asserts that "[w]hen questioned about those three pages during her deposition, [Ms. Staten] admitted that those three pages alone did not present 'a clear picture' of [Mr. Staten's] treatment for his falls," *id*. at 33–34 (citing Doc. 59-1 at 94:9), and "stated 'well, I must have faxed them and some of them got messed up because something is missing,'" *id*. at 34 (quoting Doc. 59-1 at 94:16–18).

Further, Federal asserts that Ms. Staten "executed a HIPAA authorization in April 2018 in connection with her claim submission, but it was for the wrong medical provider." *Id*. (citing Doc. 58-8; Doc. 58-10 at 1). Federal further asserts that its third party administrator "made multiple follow-up requests, and eventually [Ms. Staten] returned a HIPAA authorization in February 2019 that was blank and was not directed to any of the hospitals at which [Mr.] Staten had been treated for his falls." *Id*. (citing Doc. 58-10 at 6–21). Federal asserts that the third party administrator

"eventually informed [Ms. Staten] that it was closing its file pending receipt of supporting documentation, after 15 months of attempts to retrieve medical records." *Id*. (citing Doc. 58-10 at 25).

Ms. Staten asserts that "[t]he evidence has proven beyond a shadow of a doubt that [she] provided everything that [Federal], . . . by and through [its] Administrators[,] requested each and every time [Federal] requested it." Doc. 72 at 66. Specifically, Ms. Staten asserts that "[m]ultiple HIPAA forms were sent to [Federal, both Notarized and signed," as were "over 580 pages of medical records." But Ms. Staten does not offer any evidence to support her assertions.

Because Federal has presented evidence of a reasonably legitimate reason for closing Ms. Staten's file, and Ms. Staten has not provided any evidence that such reason was debatable, Federal's motion for summary judgment on the bad faith claim is **GRANTED**.

### C. Ms. Staten's Motion for Summary Judgment

The court's Replacement Initial Order provides that "[a]ll motions must comply with the requirements of th[at] order," and that "motions and brief that do not conform to the requirements of th[e] order may be stricken" except for when good cause is shown. Doc. 28. Further, the Replacement Initial Order provides that "[a]ny motion for summary judgment . . . must comply with all requirements of Appendix II to th[e] order." *Id*. at 7. Appendix II of the Replacement Initial Order

provides that "[t]he court will set a deadline for the parties to file dispositive motions," and "[a]ny motion for summary judgment . . . must be filed on or before that deadline." *Id*. at 13. The court's deadline for filing dispositive motions was on January 11, 2021, Doc. 43, but Ms. Staten filed her motion for a summary judgment on January 13, 2021, Doc. 61. Although Ms. Staten failed to comply with the court's deadline for filing dispositive motions and the instructions in its initial order, *see* Docs. 28, 43, Federal did not raise the untimeliness of Ms. Staten's motion as an issue in its response. *See* Doc. 70. Accordingly, the court exercises its discretion to consider Ms. Staten's motion regardless of its tardiness.

In her motion for summary judgment, Ms. Staten asserts that "Federal . . . falsely stated that [it] ha[s] never received any HIPAA authorization forms . . . that were necessary for [it] to gather the medical records [it] needed for the insured, Mr. Staten." Doc. 61 at 17. In support of that assertion, Ms. Staten provides a copy of a letter from Federal's third party administrator requesting a "[s]igned HIPAA Medical Authorization Release," a "[s]igned Next of Kin Affidavit," and "[a] copy of [Ms. Staten's] Marriage Certificate/License." Doc. 51 at 11–13. Attached to that letter is a signed and notarized Affidavit of Next of Kin, *id*. at 12, as well as a signed and notarized HIPAA release form, but that form does not have the facility or patient information sections completed, *id*. at 13.

Federal asserts that its "investigation was delayed first by [Ms. Staten] presenting a HIPAA authorization for the wrong medical provider" and, "[t]hen, after months of follow-up requests, [Ms. Staten] submitted a HIPAA authorization in February 2019 that was simply blank and did not provide authorization for Federal to obtain medical records from any of the hospitals at which [Mr.] Staten had been treated for his falls." Doc. 70 at 30 (citing Doc. 58-8 and Doc. 58-10 at 1, 6–21). For the same reasons that Federal's motion for summary judgment on the bad faith claim is granted, *see supra* at pp. 50–52, Ms. Staten's motion for summary judgment on that claim fails.

Ms. Staten does not otherwise offer any evidence in support of her conclusory assertions and recitations of case law in her motion for a summary judgment. *See* Doc. 61 at 16–20. Because Ms. Staten did not carry her burden to establish "that there is no genuine dispute as to any material fact and [she] is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a), her motion for a summary judgment is **DENIED**.

## IV.   CONCLUSION

For the foregoing reasons, Federal's Motion to Exclude Expert and Opinion Testimony from Dr. Kathleen Fix, Doc. 49, is **GRANTED IN PART** and **DENIED IN PART**, Ms. Staten's Motion to Exclude Federal's Exhibit 25, Document 58-5, Doc. 63, and Motion to Exclude Federal's Expert Dr. Aaron Sylvan Lord Report,

Doc. 64, are **DENIED**, Federal's Motion for Summary Judgment, Doc. 55, is **GRANTED IN PART** and **DENIED IN PART**, and Ms. Staten's  Motion for Summary Judgment, Doc. 61, is **DENIED**.

 **DONE** and **ORDERED** this 29th day of September, 2021.

          **ANNA M. MANASCO**
          UNITED STATES DISTRICT JUDGE